UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN S. PETERSON AS TRUSTEE ON
BEHALF OF THE BANKRUPTCY
ESTATE OF LESLEE MACDONALD,

    Plaintiff,

v.

THE KROGER CO. AND FRED MEYER
STORES, INC, dba QUALITY FOOD
CENTERS, INC.,

    Defendants.

Case No. 08-05489 RJB

ORDER DENYING
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT

This matter comes before the court on Defendants' Motion for Summary Judgment. Dkt. 29. The court has considered the relevant documents in support of and in opposition to the motion and the remainder of the file herein.

## I. PROCEDURAL HISTORY:

On December 18, 2007, Leslee MacDonald, appearing *pro se*, filed a complaint against Quality Food Centers, Inc. and Kroger Co. in Jefferson County Superior Court. Dkt. 4. On March 25, 2008, Ms. MacDonald filed for bankruptcy, which subjected the defendants to an automatic bankruptcy stay. Dkt. 4. On July 31, 2008, the defendants accepted service of an amended complaint by the new plaintiff John Peterson, the Chapter 7 bankruptcy trustee for Ms. MacDonald. Dkt. 4. On August 6, 2008, the defendants removed the case to this court on the basis of diversity of citizenship. Dkt. 1. On March 24, 2009, the court dismissed all of the plaintiff's claims against defendant Kroger Co. and eight of plaintiff's

eleven claims against defendant QFC. Dkt. 28.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT:

On April 13, 2009, the defendants filed a motion for summary judgment. Dkt. 29. The defendants request that the court dismiss the plaintiff's three remaining claims of age, gender and disability discrimination. *Id*. In this case, the plaintiff alleges that Leslee MacDonald's termination of employment by QFC violated the Washington Law Against Discrimination ("WLAD"). In the defendants' motion for summary judgment, they argue that the plaintiff cannot establish a prima facie case for age, gender or disability discrimination and, even if so, the plaintiff has no evidence of pretext. Dkt. 29.

On May 4, 2009, the plaintiff filed a response to the defendants' motion for summary judgment. Dkt. 37. The plaintiff argues that the court should not grant the defendants' motion because there are genuine issues of material fact present. *Id*. Specifically, the plaintiff argues that he has made a prima facie case for age, gender and disability discrimination under the WLAD and there is sufficient evidence of pretext. *Id*.

On May 8, 2009, the defendants filed a reply to the plaintiff's response. Dkt. 38. In this reply, the defendants argue that there are no disputed facts and that QFC was legally authorized and contractually obligated to terminate Ms. MacDonald's employment at the end of her 6-month leave. Dkt. 38. The defendants also argue that the declaration of Dr. Tristan McGovern includes expert testimony and should be stricken because he was only disclosed as a fact witness as Ms. MacDonald's treating physician. Dkt. 38. The court should deny the defendants' motion to strike because the court only relies on Dr. McGovern's testimony as Ms. MacDonald's treating physician and, in making its determination, did not consider Dr. McGovern's "expert testimony." The defendants also assert that some of the plaintiff's declarations include inadmissible hearsay that should be stricken. Dkt. 38. The court should deny the defendants' motion to strike this testimony because the court did not rely on this evidence in making its determination.

## III. RELEVANT FACTS:

Quality Food Centers, Inc. (QFC) hired Leslee MacDonald on June 22, 1997. Dkt. 30. Ms. MacDonald first worked in the meat department but then was promoted to pricing manager, also known as Point of Sale. Dkt. 37-3. Ms. MacDonald is currently 52 years old and was 48 years old when she was

terminated from QFC. Dkt. 37-3.

*A. Job Description and Applicable Collective Bargaining Agreement:*

The job description for Ms. MacDonald's position regularly requires that the employee sit up to 1 hour without taking a break, up to 5 hours per day; talk and hear; use hands and finger to handle, and/or feel objects, tools, or controls; and, reach up and out with hands and arms. Dkt. 30. The Point of Sale position frequently requires that the employee lift up to 10 pounds up to 6 feet and carry it for a distance of 25 feet, and push and pull up to 10 pounds for a distance of 2 feet. *Id.* The job description also occasionally requires an employee to dynamically stand up to 5 minutes without a break, up to 2 hours per day; walk up to 15 minutes without a break, up to .5 hours per day; twist upper torso; stoop, kneel, crouch and/or crawl; and lift up to 50 pounds up to 6 feet and carry it for a distance of 25 feet. *Id.*

As a grocery employee of the QFC Port Hadlock store, Ms. MacDonald was a member of the collective bargaining unit that was represented by the United Food and Commercial Workers Locals 381 and its successor, United Food Commercial Workers No. 1001. Dkt. 30. These collective bargaining units had identical provisions in their collective bargaining agreements concerning leave; namely, (1) the expiration of seniority when an employee goes on leave for more than 120 days, and (2) a 6-month maximum leave for non-work injuries and illnesses. Dkt. 30. Furthermore, both collective bargaining agreements required that an employee submit a written medical certificate of fitness for duty before returning to work after a medical leave of absence. Dkt. 30. The collective bargaining agreements also mandated that QFC terminate the employment of any employee who failed to return to work after his or her period of approved leave expired. Dkt. 30.

*B. Leave of Absence:*

On June 19, 2004, Ms. MacDonald applied for a medical leave of absence following an injury to her foot and shoulder that she sustained while off from work. Dkt. 30; Dkt. 37-3. On her application for leave, Ms. MacDonald's doctor certified that she would need leave for six weeks. *Id.* QFC's Human Resources Department notified Ms. MacDonald that her leave was approved through July 31, 2004, and that she would be required to present a fitness-for-duty certificate prior to being restored to employment. *Id.* QFC also stated in its letter approving Ms. MacDonald's leave that "failure to keep in contact with your store or to update your leave may result in termination of your employment by voluntary resignation." Dkt. 30.

On July 28, 2004, Ms. MacDonald's physician requested an additional six weeks of leave. Dkt. 30. QFC granted this request. *Id*

On September 2, 2002, Ms. MacDonald's physician again requested an additional six weeks of leave. Dkt. 30. QFC again granted this request. *Id*.

On September 29, 2004, Ms. MacDonald's physician requested an additional eight weeks of leave. Dkt. 30. QFC granted this request. *Id*.

Ms. MacDonald contends that while on leave she or her husband would keep the Store Manager Dan Diederich and Assistant Manager Kevin Taylor informed about the status of her injury. Dkt. 37-3. Ms. MacDonald alleges that during one of these conversations, prior to December 13, 2004, Mr. Diederich told her that she would be working with John Stanton when she returned because "Stanton was not happy in the job he was doing because he had to work 2 nights a week and his wife was going to school so that was not working out for his family." Dkt. 37-3.

Ms. MacDonald's doctor, Tristan McGovern, stated in his declaration that Ms. MacDonald was taken out of her cast and put into a CAM boot on November 11, 2004, and that by November 22, 2004, she was progressing well and bearing some weight on her foot. Dkt. 37-5.

On November 24, 2004, Trish Meier, QFC's Payroll Administrator, sent a letter to Ms. MacDonald notifying her that on December 18, 2004 her maximum leave time would expire. Dkt. 30. The letter stated:

> Under the Company Policy, you are entitled to **a maximum of 26 weeks leave time** for illness or off the job injury. As of **December 18, 2004** you will have reached that maximum. It is recommended that you contact your Store Director to make arrangements to return to work without restrictions. If you have not returned to work within two (2) weeks from the above date (**December 31, 2004**) it will be considered your voluntary resignation from the Company. If you have any questions regarding this matter, please contact your Store Director or you may call me at 1-800-858-9202 x 3475.

Dkt. 30 (emphasis in the original). Ms. MacDonald alleges that she received this letter on November 29, 2004 and understood her store director to be Mr. Diederich. Dkt. 37-3. Ms. MacDonald also contends that she understood that she would need to return to work by December 31, 2004. Dkt. 37-3.

Ms. MacDonald states that after receiving Ms. Meier's November 24th letter she made an appointment with her doctor in order to ensure that she could be back to work by December 31, 2004. Dkt. 37-3. She contends that the earliest appointment the she could get with her doctor was December 13, 2004. Dkt. 37-3. Ms. MacDonald maintains that she had seen her doctor on November 22, 2004, shortly

before receiving Ms. Meier's letter. Dkt. 37-3. Ms. MacDonald states that on November 1, 2004, she started wearing a CAM boot and was bearing some weight on her foot by November 22, 2004. Dkt. 37-2.

*C. The Events of December 13, 2004:*

On December 13, 2004, Ms. MacDonald went to see her doctor. Dkt. 37-3. Ms. MacDonald's physician, Dr. McGovern, informed her that the screw he had put in her foot in October was still as stable as it was in October and November 2004. Dkt. 37-3. Ms. MacDonald understood this to mean that she could start putting full weight on her left foot. Dkt. 37-3.

Ms. MacDonald alleges that on this same day she spoke with Mr. Diederich concerning a note from her doctor, which indicated that she would be released with no restrictions in early January 2005. Dkt. 37-3. Ms. MacDonald contends that she told Mr. Diederich that she was almost ready to return to work and that she was wearing a CAM boot. Dkt. 37-3. Ms. MacDonald states that she asked Mr. Diederich if she could return to work wearing the CAM boot and, if so, she would go back to see her doctor and get a release from him to return to work wearing the CAM boot for just a few weeks. Dkt. 37-3. Ms. MacDonald maintains that she told Mr. Diederich that she was putting full weight on her foot and that her doctor would give her a release to return to work if he saw that she was not having pain. Dkt. 37-3. Ms. MacDonald contends that she could do her job duties with a CAM boot on. Dkt. 37-3. Ms. MacDonald's physician, Dr. McGovern, states that "[he] would have been comfortable releasing [Ms. MacDonald] to return to work with a CAM boot as of December 15, 2004." Dkt. 37-5.

Ms. MacDonald alleges that Mr. Diederich told her that she could not return to work wearing the CAM boot because store policy prohibited her from wearing a CAM boot or any orthopedic device to work. Dkt. 37-3. Mr. Diederich does not address this specific conversation in his declaration; he only states that he "does not recall Ms. MacDonald presenting a doctor's note stating that she could return if she could wear an orthopedic device, nor do[es] [he] recall ever seeing a note from her doctor about returning to work after June 2004 with or without an orthopedic device." Dkt. 32.

Ms. MacDonald states that she did not know of this policy and that her sister Debbie Steinfort, a deli manager at QFC, wore an orthopedic sandal to work because of foot problems. Dkt. 37-3. Ms. MacDonald alleges that she saw another employee, Kimmi Hopson, wearing a CAM boot while working as a cashier at QFC. Dkt. 37-3. Therese Bowers-Hughes, Ms. MacDonald's pricing assistant, alleges that she

also saw Ms. Steinfort and Ms. Hopson wear these devices. Dkt. 37-4.

QFC contends that its policy is to not "allow injured workers to return from leave utilizing orthopedic devices or prostheses that will be unsafe." Dkt. 30. The defendant states that its policy is to have "Human Resources work directly with the returning employee and, on occasion, the health care provider, to make certain the worker can return safely to work utilizing safe orthopedic devices or prostheses." *Id*. The employee handbook does not directly address a CAM boot or orthopedic devices but does state that "[t]he use of a good slip-resistant shoe will prevent you from having a slip and fall injury." Dkt. 37-3. The employee handbook does not state that the dress code requires slip-resistant shoes

Ms. MacDonald contends that during this same conversation she asked Mr. Diederich if he gave her job as Pricing Manager to John Stanton and that Mr. Diederich replied yes. Dkt. 37-3. Ms. MacDonald maintains that Mr. Diederich then stated that he gave Mr. Stanton her job because "John had a family and it was important for him to have enough hours to support his family and that John would work days so that he could be with his family at night as his wife was going to school." Dkt. 37-3. Ms. MacDonald states that Mr. Stanton was in his 30's when these events allegedly occurred in 2004. Dkt. 37-3. Ms. Bowers-Hughes, Ms. MacDonald's pricing assistant, contends that she overheard Mr. Diederich speaking with his assistant manager, Mr. Taylor, and that Mr. Diederich would make "very rude and demeaning remarks about the older women employees in the store." Dkt. 37-4.

Also on December 13, 2004, Ms. MacDonald's doctor requested another four weeks of medical leave. Dkt. 30. QFC denied this request. *Id*. QFC contends that this request was denied because "it exceeded the maximum number of weeks (26) authorized by the collective bargaining agreement for medical leave for off-job injuries." *Id*. QFC maintains that the Human Resources department "unilaterally determined that [Ms. MacDonald's physician's December 13, 2004] leave request exceeded the maximum authorized leave." *Id*. It is unclear from the record: whether this request was before or after Ms. MacDonald's conversation with Mr. Diederich. Dkt. 30.

*B. The Events of December 15, 2004:*

On December 15, 2004, Ms. Meier, QFC's Payroll Administrator, wrote another letter to Ms. MacDonald, which stated that Ms. MacDonald did not qualify for any extension of leave beyond December 18, 2004, because then she will have exhausted her leave time available under her Collective Bargaining

ORDER
Page - 6

Agreement and State and Federal Leave Laws. Dkt. 30. Ms. Meier again told Ms. MacDonald that if she was unable to return to work her employment would be terminated and it would be treated as a voluntary resignation. *Id.*

*C. The Events of December 17—18, 2004:*

Ms. MacDonald maintains that she received Ms. Meier's second letter on December 17, 2004. Dkt. 37-3. Ms. MacDonald states in her declaration that this letter informed her that she was terminated as of Saturday, December 18, 2004. Dkt. 37-3. However, the letter does not explicitly state that Ms. Macdonald would be terminated on December 18, 2004, but rather it states that she "did not qualify for an extension of leave beyond December 18, 2004," and that "should [she] be unable to return to work, the Company will have no alternative but to terminate [her] employment as a voluntary resignation." Dkt. 37-3.

Ms. MacDonald alleges that she did not receive notice that she needed to return to work before December 31, 2004. Dkt. 37-3. (As discussed earlier, Ms. Meier's November 24th letter indicated that Ms. MacDonald needed to return to work by December 31st.) Dkt. 30. Ms. MacDonald states that Ms. Meier's December 15th letter informed her that she had exhausted her leave and needed to return to work before December 18, 2004. Dkt. 37-3. Furthermore, Ms. MacDonald contends that she had several conversations with Mr. Diederich prior to December 13, 2004, and that he never informed Ms. MacDonald that she had to return to work before December 31, 2004. Dkt. 37-3. Ms. MacDonald states that she could not have contacted her doctor on a Saturday or Sunday or gotten a note from her doctor within 24 hours on the weekend and that she relied on Ms. Meier's first letter informing her that she had until December 31, 2004, to return to work. Dkt. 37-3.

On December 18, 2004, QFC terminated Ms. MacDonald's employment. Dkt. 30. Defendant QFC states that it has "no record of Ms. MacDonald ever providing a medical release in November or December 2004 or in 2005 indicating that she could return to work to perform the essential functions of her job or any job." Dkt. 30. Furthermore, QFC states that it has no record of Ms. MacDonald reapplying for employment after December 18, 2004. *Id.*

Also on December 18, 2004, Ms. MacDonald wrote a letter to Jim Fenton, Human Resources Director for QFC, Dkt. 30. In this letter, Ms. MacDonald states that "on Tuesday December 13, 2005, [she] called and spoke with [Mr. Diederich] regarding [her] Physicians [*sic*] letter and told him that he had

[her] off another 4 weeks, but [she] might be able to return to work sooner if [she] can put full pressure on [her] foot and that if [she] can, [she] is supposed to go back to him and he will release [her] if he sees that [she ] has no pain, he understood [*sic*]." Dkt. 30.

## IV. DISCUSSION:

Pursuant to *Erie Railroad Co. v. Tompkins*, 304 U.S. 604, (1938), in diversity cases, a federal court applies state substantive law to state law claims. The plaintiff asserts claims of disability, age and gender discrimination under the Washington Law Against Discrimination ("WLAD"). Under WLAD, it is an unfair practice for an employer to discharge or bar any person from employment because of sex, age or disability. *See* RCW 49.60.180(2). Washington case law recognizes federal case law and the *McDonnell Douglas* burden-shifting framework as a guide in understanding WLAD claims, but only when it "best further[s] the purposes and mandates of" WLAD. *See Grimwood v. University of Puget Sound*, 110 Wn.2d 355, 362 (1988).

### *A. Summary Judgment Standard:*

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party must present specific, significant probative evidence, not simply "some metaphysical doubt.") *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

*B. Disability Discrimination*:

To survive summary judgment, the plaintiff must make out a prima facie case of disability discrimination and show that (1) Ms. MacDonald had a disability that substantially limited her ability to do the job; (2) she was qualified to do the job; (3) she gave QFC notice of the disability and its substantial limitations; and (4) after notice, QFC failed to adopt available measures that were medically necessary to accommodate the disability. *See Becker v. Cashman*, 128 Wn.App. 79, 85 (2005).

Here, the plaintiff alleges sufficient evidence to establish a prima facie case of disability discrimination. The defendants dispute this evidence. The defendants argue that, under *Ferguson v. Wal-Mart Stores, Inc.*, 114 F. Supp. 2d 1057, 1069 (E.D. Wash. 2000), the defendants' duty to discuss a reasonable accommodation is triggered when the disabled employee's physician provides a release for work, which indicates that the employee can return to work with reasonable accommodations. In this case, the facts are unclear whether Ms. MacDonald would have contacted her physician and obtained this type of release had Mr. Diederich told her that she could return to work with a CAM boot or directed her to speak with QFC Human Resources. Furthermore, there are unresolved issues of fact: including whether Ms. MacDonald was capable of performing her job duties with a CAM boot, whether Ms. MacDonald gave QFC notice of her request to wear a CAM boot, and whether QFC clearly communicated to Ms. MacDonald the procedure to provide a doctor's release and return to work. Because of these disputed facts, the court should not grant the defendants' motion for summary judgment on the issue of disability discrimination.

Furthermore, genuine issues of material fact exist as to pretext. The defendants argue that the

1 legitimate non-discrimination reason why they terminated Ms. MacDonald was because she failed to
2 provide a doctor's release to return to work and her maximum leave of 26 weeks had expired. However,
3 genuine issues of material fact exist including whether Ms. MacDonald needed to return to work by
4 December 18, 2004, or December 31, 2004, whether Ms. MacDonald's doctor requested an additional four
5 weeks of leave before Ms. MacDonald went to speak with Mr. Diederich about returning to work, and
6 whether Ms. MacDonald was to coordinate her return to work through her store director or through QFC
7 Human Resources. Because of these disputed facts, the court should not grant summary judgment on the
8 issue of disability discrimination.

*C. Age/Sex Discrimination:*

In order for the plaintiff to make a prima facie case of age discrimination, the plaintiff must show that Ms. MacDonald (1) was within the statutorily protected age group; (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a younger person. *See Grimwood,* 110 Wn.2d at 362. For a prima facie case of sex discrimination, the plaintiff must show that Ms. MacDonald (1) was a woman; (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a person of the opposite sex or otherwise outside the protected group. *See Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 71, 80 (2004).

In this case, the plaintiff alleges sufficient evidence to make a prima facie case of age and sex discrimination. The defendants dispute this evidence. Specifically, issues of material fact exist whether Ms. MacDonald was doing "satisfactory work" and could return to work with a doctor's release as well as whether Mr. Stanton, who is male and, in 2004, was in his thirties, actually replaced Ms. MacDonald at QFC. *See* Dkt. 37.3; Dkt. 30. Because of these disputed facts, the court should not grant the defendants' motion for summary judgment on the issues of age and sex discrimination.

There are also genuine issues of material fact surrounding the plaintiff's evidence that the defendants' legitimate non-discriminatory reason for terminating Ms. MacDonald was pretext for age and sex discrimination. The defendants allege that QFC terminated Ms. MacDonald because she failed to provide a doctor's release to return to work and had used her maximum leave time allowed by the collective bargaining agreement. However, the plaintiff presented some evidence of pretext including that Mr. Diederich allegedly made negative comments about older women in the work place and told Ms.

MacDonald that the reason he gave her position to Mr. Stanton was because he had a family to support. Dkt. 37-3. The defendants dispute this evidence. Dkt. 38. Also, other genuine issues of material fact are present: including what day Ms. MacDonald was to return to work, whether she was to coordinate her return through QFC Human Resources or her store director, and whether Ms. MacDonald could return to work with a CAM boot. Because of this disputed fact issues, the court should not grant the defendants' motion for summary judgment on the issues of age and sex discrimination.

## V. CONCLUSION:

There are genuine issues of material fact that need to be resolved by the trier of fact, and, for this reason, the court should not grant the defendants' motion for summary judgment.

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 29) is **DENIED** and the Defendants' Motion to Strike (Dkt. 38) is **DENIED.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 13th day of May, 2009.

*Robert J. Bryan*
Robert J. Bryan
United States District Judge